ARGUED MAY 10, 1974 — DECIDED SEPTEMBER 10, 1974 — REHEARING DENIED OCTOBER 1, 1974 —

*Scheer & Elsner, Robert A. Elsner,* for appellant.
*Albert E. Wallace, Wm. R. L. Latson,* for appellees.

## 49549. HEILMAN v. THE STATE.

776

*Wm. R. Hurst,* for appellant.

*Eldridge W. Fleming,* District Attorney, for appellee.

Pannell, Presiding Judge.

Headnote 1 is the only ruling requiring any elaboration. The alleged stolen property involved was a microscope identifiable by serial number which the evidence shows was purchased by Scientific Products Company, and was subsequently discovered to be missing and found in the possession of a local hospital, and that it had never been disposed of or sold by the owner. There was no dispute that the defendant sold this microscope to the hospital. The evidence shows that defendant was a former employee of Scientific Products Company, the owner of the microscope, and had been employed as a salesman, but was not so employed at the time of the alleged offense. The doctor who acted as agent of the hospital in purchasing the microscope testified that the defendant told him that he owned the scope and "stated he had been in this area of endeavor and was leaving it, that's why he had some material he was disposing of." Larry Granger, a sales representative of Scientific Products Company testified about a conversation he had with the defendant in August of 1973, after the warrant was sworn out against the defendant: "Q. What was the substance of the conversation that you had with the defendant about this microscope? A. Mr. Heilman called me in the evening at my home and asked did I know anything about a microscope being stolen that he had sold; I told him I was not aware of the situation and I did not want to become aware of the situation. Q. Did he say anything further about the microscope, did he say where he sold it? A. No, I knew where the scope was sold that was stolen; it was here in town. Q. Here in Carrollton? A. Right. Q. Do you know to whom it was sold? A. Carrollton Clinic. Q. Did the defendant tell you anything at all about how he came into possession of this particular microscope? A. Mr. Heilman to the best of my knowledge told me that he *came by this scope by means other than legal.* He didn't say illegal, he said, if I remember

correctly — Mr. Hurst: I'll object to the answer at this point, he's laid the foundation when he starts thinking. The Court: Tell us what you know. A. I wrote a letter to my employer concerning this conversation after it happened and *Mr. Heilman told me he came by this microscope by a shady deal.* Mr. Hurst: Your Honor, I move the answer be stricken from the record; that's exactly what I've objected to and Your Honor sustained the objection to such an answer as that. A. That's not thinking, that's what Mr. Heilman told me, to the best of my knowledge. The Court: Objection overruled."

The defendant, in his testimony, explained his acquisition of the property from a Mr. Dan Bart. This testimony was as follows: "Q. Do you know a Mr. Dan Bart? A. Yes, I do. Q. How did you first get to know Mr. Dan Bart? A. Well, I was separated in 1972 from my wife at which time I moved into the apartment I'm presently living in. At this time it was owned by another gentleman and Mr. Bart was one of the residents within the building. Q. One of the two houses? A. Well, no, at that time I didn't have the other house. Q. Okay. What was Mr. Bart doing for a living? A. At that time Mr. Bart was really trying to do about anything he could do. His background was, he was a mechanical engineer and he had previously dealt in, to the best of my knowledge in environmental equipment and bacteriological equipment. Q. Did you have any dealing with Mr. Bart? A. Most definitely. Q. The scope that's been introduced in this case, would you tell us to the best of your memory where you bought this scope, if you did? A. Yes. This particular scope belonged — four or five other articles of equipment at the time — I don't remember specifically all types of equipment because of various reasons, a lot of other business that I was involved in — I didn't purchase this equipment from Mr. Bart; Mr. Bart gave me this equipment because Mr. Bart was heavily in debt to me and I gave him more than a fair amount for the amount of money he owed me, I probably knew I'd never probably get the money. Q. Do you recall approximately how much money he owed you? A. At that time he only owed me about $2,000; of course he got quite a bit more later on. Q. What was your agreement; did you agree to wipe out the debt for the

equipment? A. No, not at all. I gave him a thousand dollars for the equipment and the only piece of equipment that I really, you know, received any compensation for was really the microscope; I still have some of the other equipment. . . Q. Who is the check from? A. The check is from Dan Bart on Fulton Exchange Bank in Alpharetta, Georgia, in the amount of $500, not processed. In other words, it bounced? A. Right. Q. Was this part of the consideration given to Mr. Bart? A. That was part of the debt he owed me. Q. Did you relinquish this debt to him for equipment, other equipment? A. No, sir, I did not. Q. Scope and other equipment? A. No, Bart owed me around that time about $2,000 and by the time he left, it was considerably more than that and I agreed in October, late October, early November to count a thousand dollars of this toward his debt; I didn't feel like I was going to get any of the money. I mean I had to — Bart worked for me at various times and I tried to help the guy, you know, get ahead, get out of some — he was in quite a few situations in his marriage and his debts. He had a tremendous amount of problems. . . Q. I think you testified earlier that Mr. Bart was in the business of buying and selling used equipment? A. No, Dan Bart was not — his past experience was that he was an engineer, he was out of Houston, Texas, he was a manufacturer's rep. To reiterate, he did sell to various companies environmental equipment and bacteriological equipment. Mr. Bart, from my research at a later date, was involved in some very serious trouble in Houston, Texas. He then came to Atlanta, was not in the manufacturer's rep. business at that time at all. Q. Did you consider it unusual that he had equipment for sale? A. At the time I didn't consider it unusual due to the equipment market and used equipment market, you can just about buy what you want to buy. You can buy it, you can buy it through — I would say in Atlanta, you could buy an AO microscope at ten different places, and as far as buying new microscopes in 1972, I don't know how many I sold, it was a good number. It wouldn't be hard to buy a microscope at all, I mean." The defendant testified that the debt Bart owed him was evidenced by a note, but did not produce the note or introduce it in

evidence and no one seemed to know the present whereabouts of Mr. Bart.

The evidence further shows that Bart did not tell the defendant where he procured the equipment and the defendant did not ask him. The retail value of the microscope was established as $1,200, and its wholesale price at $805. It was sold for $700 by the defendant.

So far as disclosed by the evidence, the trial was the first time defendant explained his possession of the microscope except when he told Larry Granger he acquired it "by means other than legal" or "by a shady deal."

"A person commits theft by receiving stolen property when he receives, disposes of, or retains stolen property which he knows or should know was stolen unless the property is received, disposed of, or retained with intent to restore it to the owner." Georgia Criminal Code Section 26-1806; *Thomas v. State,* 130 Ga. App. 613, 614 (203 SE2d 922). This crime, because of its very nature is one that is usually proved in whole or in part by circumstantial evidence. The fact that a person knows, or should know that goods are stolen may be shown by circumstances which would excite suspicion in the mind of an ordinarily prudent man. *Arkwright v. State,* 57 Ga. App. 221 (1) (194 SE 876); *Williams v. State,* 16 Ga. App. 697, 698 (6) (85 SE 973); *Nichols v. State,* 111 Ga. App. 699 (2) (143 SE2d 41); *Prather v. State,* 116 Ga. App. 696 (1) (158 SE2d 291); *Hudgins v. State,* 125 Ga. App. 576, 578 (188 SE2d 430). Discrepancy in value is another element which may be considered in connection with the knowledge of the defendant. *Pharr v. State,* 26 Ga. App. 433 (106 SE 306); *Hudgins v. State,* 125 Ga. App. 576, 578, supra. This alone is sufficient to excite suspicion. The defendant was knowledgeable as to the value of the microscope, he having previously been a salesman for the very concern from which the microscope was stolen. He sold it for less than the wholesale value. The evidence of the defendant is slightly conflicting as to whether he purchased this equipment, together with other equipment from Bart or whether he merely gave him credit on an indebtedness owed the defendant. This lack of certainty in his explanation is another element which

might be considered. But the element which amply justifies the conclusion of the jury that he knew or should have known that the goods were stolen is his own admission that *at the time he received* the microscope he got it through a shady deal or by means other than legal. This portion of the conversation with Larry Granger is not a statement of "after the fact knowledge," but is a statement that *at the time* he acquired the microscope he knew his acquisition was other than legal and was a shady one. That his *actual* knowledge the goods were stolen came after the warrant was sworn out and was included in the conversation with Larry Granger; and that this portion of the conversation may have been a statement of "after the fact knowledge" (see *Johnson v. State,* 122 Ga. App. 769 (178 SE2d 772)) does not prevent his admission from being compelling evidence against him. The evidence, as we view it, was amply sufficient to authorize the jury's verdict. "After the verdict, the testimony is construed in its most favorable light to the prevailing party, which in this case is the state, for every presumption and inference is in favor of the verdict. *Bell v. State,* 21 Ga. App. 788 (95 SE 270)."

It is for the jury to weigh the evidence and determine the credibility of the testimony and the witnesses.

*Judgment affirmed. Clark and Webb, JJ., concur.*